301 S.E.2d 765

**STATE of West Virginia**

v.

**Charles Richard FLINT.**

No. 15248.

Supreme Court of Appeals of
West Virginia.

March 11, 1983.

Jesser & Harrington, Travers R. Harrington, Jr. and Frederick A. Jesser, III, Fayetteville, for appellant.

Chauncey H. Browning, Jr., Atty. Gen., and S. Clark Woodroe, Asst. Atty. Gen., Charleston, for appellee.

McHUGH, Justice:

This action is before this Court upon the appeal of Charles Richard Flint, the appellant, from a judgment of the Circuit Court of Fayette County, West Virginia, which found him guilty of first degree murder. The appellant was sentenced to life imprisonment, without recommendation of mercy, in the West Virginia State Penitentiary. This Court has before it the petition for appeal, all matters of record, and the briefs and oral argument of counsel.

In this appeal the appellant asserts seven errors.[1] Those assertions are: (1) the trial court erred in denying appellant's motion to suppress evidence relating to a .25 caliber Beretta pistol which was found as a result of a warrantless search of an automobile in which the appellant was a passenger; (2) the trial court erred in denying appellant's motion to dismiss the charge of murder against him because he was extradited from Nevada to West Virginia without the benefit of counsel; (3) the trial court erred in denying appellant's motion to dismiss the charge of murder because the trial was the second of two murder trials, both of which arose from a single transaction thereby violating state and federal constitutional prohibitions against double jeopardy; (4) the trial court erred in denying the appellant's motion of recusal of the trial judge; (5) the trial court erred in denying appellant's motion for a psychiatric evaluation; (6) the trial court erred in denying appellant's motion for a continuance in order that he might secure an expert witness on the issue of handwriting identity; (7) the trial court erred in allowing the prosecution, during closing arguments, to argue facts which were not supported by the evidence.

On September 21, 1978, the appellant took, at gunpoint, a certain sum of money from Otis Kinder, the owner of the Layland Grocery, and then fatally wounded Kinder. As the appellant fled the premises, he encountered Lloyd Andrew Smith on the parking lot adjacent the grocery. The appellant then shot Smith and took Smith's automobile.

On October 1, 1978, Officer O.C. Pigford of the Las Vegas, Nevada Metropolitan Police Department, observed an automobile with out-of-state license plates being driven in an erratic manner on an East Las Vegas

---

1. In his brief the appellant also alleges three other errors. Two of those include allowing into evidence certain exhibits when a closed chain of custody had not been shown and admitting into evidence reference to other crimes committed by the appellant. However, appellant did not argue or brief those assignments of error nor direct the Court's attention to relevant portions of the record which sustain the propositions he raises. As this Court held in syllabus point 6 of *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981): "Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived." *See also State v. Buck,* 170 W.Va. 428, 294 S.E.2d 281, 284, n. 2 (1982). Accordingly, those two assignments of error will be considered abandoned. The third assignment is that the prosecution was allowed to have copies of a report of a ballistics test that the appellant had made. The appellant does not cite the portion of the record

relating to that alleged error. That a court of record speaks only by its records is the general rule. *State v. Nuckols,* 152 W.Va. 736, 166 S.E.2d 3 (1968). Compare, however, syllabus point 3 of *State ex rel. Scott v. Boles,* 150 W.Va. 453, 147 S.E.2d 486 (1966), where this Court held with respect to a criminal habeas corpus proceeding:

It will be presumed, where the record is silent, that a court of competent jurisdiction performed its duties in all respects as required by law. There is, however, an exception with regard to this presumption relating to the right to the assistance of counsel which is a fundamental constitutional right provided in both the State and Federal Constitutions.

We, therefore, presume the proceeding to be regular. Syllabus point 17, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). Thus, we will not consider that assignment of error.

highway. After following the automobile for a distance of one to two long blocks the officer decided, in order to determine the condition of the driver, to stop the automobile and make an inquiry. After activating his flashing lights and siren the officer saw a passenger, who later was determined to be the appellant, make certain gestures. Those gestures included taking an object either from his waistband or pocket, leaning over and placing it beneath the front seat where he was sitting. After stopping the automobile the officer asked the driver, the appellant and the other passenger to exit and produce identification, which they did. The officer took this information and checked to see if there were any outstanding warrants against any of them. A few minutes later the officer received information that the appellant was wanted in West Virginia for "unlawful killing with a gun." Upon placing the appellant under arrest the officer looked under the front seat of the automobile and found a .25 caliber Beretta pistol.

Following the arrival of another patrol car the appellant was placed in custody. The driver and other passenger were allowed to resume their journey. A citation was not issued to the driver.

While in the custody of the Nevada authorities, the appellant was extradited to West Virginia. Although he contends he requested to be represented by counsel during the extradition proceedings, appellant's requests were denied.

The appellant was returned to Fayette County, West Virginia, and was tried and convicted in May, 1979, of the murder of Otis Kinder. In March, 1980, the appellant was tried and convicted of the murder of Lloyd Andrew Smith before the same judge who had presided over appellant's earlier murder trial of Kinder. It is from appellant's second murder conviction that he now appeals to this Court.

**I**

**The Warrantless Search**

■ Appellant's first assertion is that the trial court erred in denying his motion to suppress evidence relating to the .25 caliber Berretta pistol which was found as a result of a warrantless search of the automobile in which the appellant was a passenger. Appellant relies on the Fourth Amendment to the United States Constitution [2] and Article III, Section 6 of the West Virginia Constitution [3] and cites three reasons why evidence relating to the pistol should have been suppressed. First, probable cause did not exist to stop the automobile. Second, the requirement that the appellant exit the vehicle and produce identification amounted to an impermissible seizure. Third, the search of the automobile which produced the pistol was unreasonable.

The appellant's first reason why the pistol should not have been admitted into evidence is that probable cause did not exist to initially stop the automobile in which he was a passenger. The facts indicate that the automobile was being driven in an erratic manner on a public highway. The officer testified that in the interest of public safety he stopped the vehicle to check on the condition of the driver to determine if he was driving under the influence of alcohol.

The same issue was before the Florida Court in *State v. Gustafson*, 258 So.2d 1 (Fla.1972), *aff'd* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). The facts in that case were that an automobile driven by the defendant was observed by a police officer to be weaving across the lane markers into another traffic lane. The officer stopped the vehicle "to find out why he had been driving that way, if he had been drinking or something." 258 So.2d at 2. The Florida Court held that the weaving movement of the vehicle created a reasonable suspi-

---

2. U.S. Const. amend. IV provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

3. W.Va. Const. art. III, § 6 provides, in part: "The rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures shall not be violated."

cion which would indicate that the driver was intoxicated, and as such constituted probable cause for stopping the vehicle.

This Court in syllabus point 4 of *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), held, in part: "An automobile may be stopped for some legitimate state interest." The legitimate state interest in the case now before us is that the safety of the public necessitated the stopping of the erratically driven vehicle. Accordingly, we find appellant's first reason to be without merit.

Appellant's second reason why the evidence relating to the pistol should have been suppressed is that the request that the appellant exit the vehicle and produce identification amounted to an impermissible seizure.

This Court in *State v. Boswell*, 170 W.Va. 433, 294 S.E.2d 287 (1982), acknowledged that "not all encounters between law enforcement officials and members of the public must be characterized as seizures. Many activities unrelated to criminal investigations bring legitimate interplay between law enforcement officials and the public—such as traffic control, accident investigation, and health and rescue missions." 170 W.Va. at 440, 294 S.E.2d at 293–94.

The facts in *Boswell* were that a police officer viewed, late at night, a parked van in an area where an arson had been committed. Upon approaching the van the officer observed suspicious behavior by an occupant of the van. The officer then tapped on the van's window and requested some identification from the defendant. The preliminary question before the Court was whether the activities of the police officer, in tapping on the window and requesting identification, constituted an impermissible seizure of the defendant.

█ In affirming the defendant's conviction we noted that many state courts [4] had adopted the view that there was some minimal level of police intrusion which did not constitute a "seizure" of the person. We held in syllabus point 1 of *State v. Boswell*, supra:

An initial police inquiry which calls into question a seizure of the person issue will ordinarily relate to some criminal investigation procedure and must originate from some suspicious circumstance involving the defendant. In determining the threshold question of whether the defendant has been seized, we look to the intensity of the initial inquiry. The less intense the initial inquiry the less likely that a seizure will be found. The intensity of the inquiry will determine whether the initial threshold of 'seizure' has been crossed. This is because the intensity of the inquiry will govern when a reasonable person would believe that he was not free to leave the initial police encounter.

█ In the case now before the Court the exiting of the appellant from the automobile did not precipitate the ensuing search of the automobile which revealed the pistol. The identification led to the search. Therefore, we need only discuss the officer's request for some identification. Thus, we must decide whether the officer's informational request was of such "intensity" as to warrant a finding that a "seizure" of the appellant had taken place.

While the circumstances surrounding the stopping of the automobile in which the appellant was a passenger did not point directly to any criminal activity they were suspicious enough to permit the officer to request some identification. Thus, given the circumstances we do not believe that a finding that a "seizure" of the appellant occurred is warranted in this case. Instead, the officer's action represented a permissible "minimal level of police intrusion." Therefore, we find appellant's second reason for the suppression to be without merit.

The appellant contends that the final reason why evidence relating to the pistol should have been suppressed at trial is that the search of the automobile in which appellant was a passenger after appellant's arrest was unreasonable.

4. *See State v. Boswell*, 170 W.Va. 439 n. 6, 294 S.E.2d at 293 n. 6.

The facts indicate that upon activating his flashing lights and siren the officer saw the appellant make furtive gestures. The appellant took an object either from his waistband or pocket and leaned over and placed it beneath the front seat where he was sitting. Additionally, this area was not searched until the appellant had been placed under arrest for "unlawful killing with a gun."

In syllabus points 4 and 5 of *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980) this Court held:

> An automobile may be stopped for some legitimate state interest. Once the vehicle is lawfully stopped for a legitimate state interest, probable cause may arise to believe the vehicle is carrying weapons, contraband or evidence of the commission of a crime, and, at this point, if exigent circumstances are present, a warrantless search may be made.

> A furtive gesture on the part of the occupant of a vehicle is ordinarily insufficient to constitute probable cause to search a vehicle if it is not coupled with other reliable causative facts to connect the gesture to the probable presence of contraband or incriminating evidence.

The furtive gestures upon the appellant's part were not the sole reasons why the officer searched under the front seat. The furtive gestures were coupled with the officer's knowledge that the appellant was wanted in West Virginia for an "unlawful killing with a gun." These "reliable causative facts" established probable cause to believe that a weapon or evidence of the commission of a crime was placed beneath the front seat.

It has long been the rule that warrantless searches and seizures made incident to a lawful custodial arrest are not unreasonable. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Moreover, the United States Supreme Court recently considered the same issue in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, *reh'g denied* 453 U.S. 950, 102 S.Ct. 26, 69 L.Ed.2d 1036 (1981). In that case a police officer stopped an automobile traveling at an excessive rate of speed. There were four men in the automobile, one of whom was the defendant. Upon investigation the officer discovered that none of the men owned the vehicle or was related to the owner. Also at this time the officer smelled burnt marihuana and viewed on the floor of the automobile an envelope marked "Supergold." He associated the term "Supergold" with marihuana. After arresting the four men for unlawful possession of marihuana, and while the four men were outside the automobile, the officer searched the passenger compartment of the car. On the back seat he found a black leather jacket which belonged to the defendant. In one of the pockets of the jacket the officer found a quantity of cocaine. The defendant was later convicted for the possession of cocaine.

In *New York v. Belton, supra*, the Supreme Court affirmed its holding in *Chimel v. California, supra*, stating that:

> [A] lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. Such searches have long been considered valid because of the need 'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence.

453 U.S. at 457, 101 S.Ct. at 2862.

This Court in *State v. Moore, supra,* noted that *Chimel v. California, supra,* "confined the warrantless search of property to that limited area immediately under the physical control of the arrested person." 165 W.Va. at 851, 272 S.E.2d at 813. This Court followed *Chimel* by holding in syllabus point 6 of *State v. Moore* that "[a] warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a valid arrest."

The *Belton* Court then decided to extend its holding in *California v. Chimel, supra,* to the interior of an automobile as well even though the defendant had exited the automobile. The Court reasoned "that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary item.' *Chimel,* 395 U.S., at 763 [89 S.Ct., at 2040]." 453 U.S. at 460, 101 S.Ct. at 2864. Thus, the Court held, *inter alia,* "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. at 460, 101 S.Ct. at 2864.

Accordingly, probable cause existed to search beneath the front seat of an automobile where the appellant was riding. The appellant's third reason to suppress evidence relating to the pistol lacks merit. We conclude that the Fourth Amendment and Article III, Section 6 were not violated.

## II

### Extradition

The appellant's second assignment of error is that the trial court erred in denying his motion to dismiss the charge of murder against him because he was extradited from Nevada to West Virginia without benefit of counsel.

The general rule is that:

In interstate extradition proceedings, the prisoner is held under the extradition process only until such time as he reaches the jurisdiction of the demanding state, and is thenceforth held under the process issued out of the courts of that state. Consequently, the regularity of extradition proceedings may be attacked only in the asylum state; after an alleged fugitive has been delivered into the jurisdiction of the demanding state, the proceedings may not be challenged.

31 Am.Jur.2d *Extradition* § 74 (1967). *See Siegel v. Edwards,* 566 F.2d 958 (5th Cir.1978); *People v. Klinger,* 319 Ill. 275, 149 N.E. 799 (1925); *People v. Cartee,* 86 Ill.App.3d 895, 42 Ill.Dec. 18, 408 N.E.2d 396 (1980). *See also Campbell v. Smith,* 308 F.Supp. 796 (S.D.Ga.1970); *People v. Willingham,* 271 Cal.App.2d 562, 76 Cal. Rptr. 760 (1969), *cert. denied* 397 U.S. 993, 90 S.Ct. 1129, 25 L.Ed.2d 401 (1970).

Moreover, this Court has held in syllabus point 5 of *State ex rel. Sublett v. Adams,* 145 W.Va. 354, 115 S.E.2d 158 (1960), *cert. denied* 366 U.S. 933, 81 S.Ct. 1652, 6 L.Ed.2d 392 (1961) that once a defendant who has been extradited to this State "the method of [the defendant's] return, even though illegal or forcible, does not invalidate his conviction ... under the due process clause of the Fourteenth Amendment."

We, therefore, hold that once a fugitive has been brought within the jurisdiction of West Virginia as the demanding state the propriety of the extradition proceedings which occurred in the asylum state may not be challenged. The extradition proceedings may be challenged only in the asylum state. Accordingly, we find appellant's second contention to be without merit.

## III

### Double Jeopardy

Appellant's third assignment of error is that the trial court erred in not granting his motion to dismiss the charge of murder because both murders arose from a single transaction, i.e., the robbery of Kinder which occurred at the grocery. Specifically, appellant contends that the second trial for the shooting of Smith violated the state and federal constitutional prohibition against double jeopardy.

The facts indicate that on September 21, 1978, the appellant took, at gunpoint, a certain sum of money from Otis Kinder, the owner of the Layland Grocery, and then fatally shot Kinder. After the appellant shot Kinder, he encountered Lloyd Andrew Smith on the parking lot adjacent the grocery. The appellant then shot Smith and took Smith's automobile.

The appellant was tried and convicted in May, 1979, of the murder of Kinder, and was sentenced to life imprisonment in the West Virginia State Penitentiary with a recommendation of mercy.

The appellant was later tried for the murder of Smith in March, 1980. The appellant was found guilty of the murder of Smith and sentenced to life imprisonment in the West Virginia State Penitentiary without a recommendation of mercy.

The thrust of the appellant's argument is that in *State ex rel. Dowdy v. Robinson,* 163 W.Va. 154, 257 S.E.2d 167 (1979),[5] *overruled on other grounds, State v. Adkins,* 170 W.Va. 46, 289 S.E.2d 720 (1982), this Court adopted the "same transaction" test for determining whether a trial of a defendant for one offense bars his trial for another offense arising from the same criminal transaction. Appellant argues that because the murder of Smith arose from the same transaction as the murder of Kinder, his trial and conviction for the murder of Smith violated the state and federal constitutional bar against double jeopardy.[6]

However, this Court in *State ex rel. Watson v. Ferguson,* 166 W.Va. 357, 274 S.E.2d 440 (1980), discussed at length the issue of double jeopardy as related to multiple murders. The facts in that case were that the defendant was charged with the murders of four persons in the early morning hours of June 25, 1979. Three of his victims were killed in one bedroom and the fourth in a nearby hallway. After being tried and convicted for one of the murders, the defendant sought to prohibit further prosecution upon the three remaining murder charges. The defendant asserted that because all four murders were a part of a single transaction, a trial on any of the remaining charges violated his double jeopardy rights.

In rejecting the defendant's double jeopardy plea this Court held in syllabus point 2: "Where multiple homicides occur even though they are in close proximity in time, if they are not the result of a single volitive act of the defendant, they may be tried and punished separately under the double jeopardy clause of Article III, Section 5 of the West Virginia Constitution."

Our reasoning in *State ex rel. Watson v. Ferguson, supra,* was contained in the following language:

We do not conceive that in fashioning a double jeopardy policy in regard to what is the 'same offense' that we can ignore the fact that multiple victims have been the subject of the defendant's acts. There can be little doubt that one function of a criminal justice system is to enable those individuals who have been victimized by the criminal acts of another to find some individual vindication of the harm done to each. Certainly, the degree of culpability and as a consequence the degree of punishment, must bear some proportion not only to the magnitude of the crime but also to the number of victims involved. These are fundamental considerations that society expects from a criminal justice system.

166 W.Va. at 348, 274 S.E.2d at 446.

In the present case, as in *State ex rel. Watson v. Ferguson, supra,* "there is no contention that the multiple homicides occurred as a result of a single volitive act on the part of the [appellant], but rather each was killed by the sequential acts of the [appellant]" who moved from one victim to the other. 166 W.Va. at 352, 274 S.E.2d at 448. The appellant's double jeopardy argument is controlled by our holding in *State ex rel. Watson v. Ferguson, supra.* Thus, we find appellant's third assignment of error to be without merit.

---

**5.** In syllabus point 1 of *State ex rel. Dowdy v. Robinson, supra,* this Court held, in part:

In West Virginia the term 'same offence' [sic] as used in the double jeopardy provision of *W.Va. Const.,* art. 3, § 5 shall be defined by . . . the 'same transaction test' which provides that offenses are the same if they grow out of a single criminal act, occurrence, episode or transaction. . . .

**6.** Article III, Section 5 of the West Virginia Constitution provides, in part: "No person shall be . . . twice put in jeopardy of life or liberty for the same offense." The Fifth Amendment to the United States Constitution provides, in part: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb. . . ."

## IV

### Recusal

 Appellant's fourth assignment of error is that the trial judge erred in denying appellant's motion that the trial judge recuse himself. Appellant's specific contention is that because the trial judge had presided over the earlier trial of the appellant for the murder of Otis Kinder the judge was aware of certain information which would be used in appellant's trial for the murder of Smith. Appellant asserts that the trial judge should have disqualified himself pursuant to Canon 3(C)(1)(a) [7] of the Judicial Code of Ethics because the knowledge the judge acquired from the previous trial amounted to "personal knowledge of disputed evidentiary facts concerning the proceeding."

Reliance on that canon by the appellant in this case verges on the absurd. The canon was not intended to preclude a trial judge from doing exactly what the trial judge did in the present case. If the appellant prevailed in his assertion the result would be very disruptive of the judicial process.

In addition, the facts indicate that the trial judge, pursuant to Rule XVII(A)(1)(b) [8] of the Trial Court Rules (1979), transmitted a copy of the motion with a letter to then Chief Justice Neely asking that the Chief Justice rule on the matter. The Chief Justice responded, in part: "I have examined the Motion and have determined, in accordance with the provisions of Rule XVII(D)(2) of the Trial Court Rules, that the Motion presents no prima facie grounds sufficient to warrant your recusal."

It is not error for a trial judge to preside over more than one criminal case involving the same defendant even though some of the facts are the same in each of the cases. *See* 46 Am.Jur.2d *Judges* § 180 (1969); Annot., 21 A.L.R.3d 1369, 1374, § 4(b) (1968).

## V

### Psychiatric Evaluation

Appellant's fifth assignment of error is that the trial judge erred in not granting the motion for a psychiatric evaluation with respect to the appellant's competency at the time of the shooting of Smith.

It has been held by this Court that the granting or denial of a defendant's motion for a psychiatric evaluation rests within the sound discretion of the trial court. In syllabus point 3 of *State v. Arnold,* 159 W.Va. 158, 219 S.E.2d 922 (1975), *overruled in part, State v. Demastus, infra,* this Court held, "[w]hether a formal inquiry as to the mental capacity or competency of a defendant should be ordered is a question to be resolved within the sound discretion of the trial court."

 The above syllabus point was later limited by syllabus point 4 of *State v. Demastus,* 165 W.Va. 572, 270 S.E.2d 649 (1980) which states, in part: "When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation." However, before "a psychiatric examination should be ordered" there must be "some showing initially that the defendant is mentally incompetent...." *State v. Myers,* 167 W.Va. 663, 280 S.E.2d 299, 300 (1981).

 The facts in this case indicate that the basis for the psychiatric evaluation was appellant's attorney's inability to "find anybody to say [the appellant] was anything

---

**7.** C. Disqualification
(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding....

**8.** Rule XVII(A)(1)(b) provides that a trial judge shall:

Transmit a copy of the motion and certificate to the Chief Justice of the Supreme Court of Appeals, together with a letter advising whether he will recuse himself from the proceeding or that a hearing on the matters surrounding the disqualification motion will be required. The letter should include such other matters as the involved circuit judge shall deem relevant.

but a normal boy in his growing up...." From this investigation appellant's attorney theorized that something must have gone "amiss or awry" with the appellant at the time of the robbery and murder.

It is obvious to us that according to the facts in this case the appellant did not make a sufficient initial showing that he was mentally incompetent at the time of the shooting of Smith. In the absence of such showing it was not an abuse of the trial judge's discretion to deny appellant's motion for a psychiatric evaluation.

## VI

### Continuance for Expert Witness

 Appellant's sixth assignment of error is that the trial court abused its discretion in not allowing a continuance in order that appellant could obtain an expert witness from North Carolina on the issue of handwriting identity.

The standard to be applied concerning the present issue is found in syllabus point 4 of *State v. Milam*, 159 W.Va. 691, 226 S.E.2d 433 (1976): "In a criminal case, the granting or denial of a motion for continuance rests in the sound discretion of the trial court and the refusal to grant such continuance constitutes reversible error only where the discretion is abused."

 The facts indicate that on the third day of trial Mrs. Mattie Flint, appellant's mother, was called as a witness by the prosecution. She was to testify that a letter she had received was written by the appellant. The letter allegedly incriminated the appellant in the shooting of Smith. However, after taking the stand she denied that the letter was written by her son. In so doing she refused to abide by an agreement she had made with the prosecution before trial that she would testify that the letter was written by the appellant.

On the fourth day of trial the appellant made it known that he too would no longer abide by his agreement not to contest the authenticity of the letter. The trial court, upon a motion by the prosecution, ordered the appellant to furnish handwriting samples. At that time the prosecution informed the appellant and the court that an expert witness would be called comparing the handwriting samples with the handwriting contained in the letter. Appellant did not make a motion at that time to secure his own expert witness. Later on the fourth day the prosecution's expert witness testified concerning the handwriting contained in the letter.

On the fifth day of trial appellant moved for a continuance so that he might bring in his own handwriting expert from North Carolina. In overruling the motion the trial court stated that if the appellant had a witness who was more readily available, the appellant would be permitted a continuance in order that testimony could be heard. The appellant, however, chose not to do so.

To support his contention the appellant relies upon *State v. Barker*, 169 W.Va. 620, 289 S.E.2d 207 (1982). In that case the trial court, on the first day of trial, ordered the defendant to give samples of his handwriting. The defendant then moved for a continuance, but the trial court denied the motion and proceeded with the trial.

In reversing his conviction on one charge of forgery we stated that:

A defendant must be given a reasonable opportunity to study the evidence and prepare his cross-examination.... [W]here the State has physical evidence that is crucial to the issue of defendant's guilt and that must be subjected to scientific analysis to assist in determining the defendant's guilt, the defendant has the right to have that evidence independently analyzed.

169 W.Va. 622, 289 S.E.2d at 209.

However, we do not believe that appellant's reliance on *State v. Barker, supra*, is well founded. It is apparent that appellant's own action, i.e., denial of the authenticity of the letter, resulted in handwriting becoming a contested issue in the case. The appellant waited an entire day before moving for a continuance in order that a handwriting expert from North Carolina might testify. In denying the motion the trial court gave the appellant reasonable

opportunity to introduce testimony from a more readily available handwriting expert. The appellant, however, chose not to do so.

Once the appellant chose, during the course of the trial, to deny authorship of the letter, and if he desired to present evidence on that issue, it was incumbent upon him to secure the necessary witness without causing any undue delay in the trial. Appellant did not do so. The trial court did not abuse its discretion in its ruling.

### VII

#### Prosecution Argument

 Appellant's seventh assignment of error is the trial court erred in permitting the prosecution to make two statements which were not supported by the evidence in its closing statements. Those statements were: (1) the .25 caliber Beretta pistol admitted into evidence was loaded; and (2) the appellant attempted to disguise his handwriting in the samples he was ordered to give before the trial court.

"The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syllabus point 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927).

After a careful review of the record we find that there was ample evidence presented at trial to support the two brief statements made by the prosecution in its closing argument. The arresting officer testified that the pistol "was loaded." Also, the prosecution in its closing statement merely suggested that the jury compare the handwriting samples of the appellant which had been admitted into evidence. The prosecution mentioned the samples because the trial court earlier held that the prosecution's expert witness was not competent to give an opinion upon the question of whether a deception by the appellant was intended in some of the handwriting samples he gave.

We find no reversible error in this case, and for the foregoing reasons, the judgment of the Circuit Court of Fayette County is affirmed.

Affirmed.